[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11537
_____

D.C. Docket No. 1:12-cv-01623-CAP

JENNY MARTIN,

Plaintiff - Appellee,

versus

ELI LILLY & CO.,
LILLY USA, LLC,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(July 21, 2017)

Before WILLIAM PRYOR, JORDAN, and BALDOCK,[*] Circuit Judges.

BALDOCK, Circuit Judge:

_____

[*] The Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit,
sitting by designation.

Plaintiff Jenny Martin obtained a jury verdict in her favor on a claim that her former employer, Defendant Eli Lilly & Company ("Lilly"), discriminated against her on the basis of her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112.  Lilly challenges the district court's denial of its motion for judgment as a matter of law because, in its view, Martin did not suffer an adverse employment action.  Exercising jurisdiction under 28 U.S.C. § 1291, we agree with Lilly and reverse.

## I.

The parties are familiar with the relevant facts and procedural history of this case, and we only summarize them here.  Martin began working at Lilly in 2001 as a pharmaceutical sales representative.  In 2004, Martin transferred from North Carolina to Atlanta, Georgia, and was also diagnosed that same year with major depressive disorder.  Beginning in July 2008, Martin worked directly under Darrell Craven in the Neuroscience Account Based Sales ("NABS") division.  For the 2009 and 2010 sales years, Craven submitted negative performance evaluations for Martin based in part on his perception of her emotional intelligence ("EQ"), a subjective measurement used to assess an employee's awareness of her environment and the impact she has on others.  He also gave her "low successful" year-end ratings.

In 2011, Lilly hired ZS Associates to help reorganize its NABS division by downsizing the sales force, drawing new sales territories, and matching existing sales representatives to the newly-drawn territories.  Lilly worked with ZS Associates to establish several "business rules" to determine which employees would be automatically placed in the newly-drawn territories and thus would be guaranteed to remain employed after the 2011 reorganization.  Relevant here, the third business rule considered each employee's HR Index score, a newly created tool that reflected a weighted blend of seniority and performance ratings for the previous three years.

As a result of the reorganization, Lilly reduced its regions in Georgia from three to two.  Martin lost the northern territory to Bessie Grant, another sales representative whose HR Index score was higher based on slightly more seniority (10.45 years to Martin's 9.88 years) and her better job performance in 2011 ("successful" versus Martin's "low successful").  The two had the same ratings in 2009 ("successful") and 2010 ("low successful").  As a result, Martin was not automatically placed in a newly-drawn territory.

Lilly announced in June 2011 that the reorganization would take place in January 2012, and it encouraged Martin and other soon-to-be-displaced employees to apply for open positions at Lilly.  From the announcement in June 2011 until March 2012, Lilly allowed the displaced employees to retain their current positions

and also provided them with full salary and benefits.  Martin applied for positions

in Atlanta and North Carolina and expressed that North Carolina was

"geographically closest to where I want to be."  Lilly offered Martin a position as a

sales representative in the NABS division in Charlotte, North Carolina, a position

for which Martin applied and which would have resulted in Martin working in the

same position from which she was displaced—again reporting directly to Craven—

but in a different location.  Lilly would have paid Martin's relocation expenses, but

Martin declined the position after deciding with her family and health care

providers that, for her mental health, she should not continue to report to Craven.

When Martin's employment with Lilly ended in March 2012, she wrote to other

Lilly employees that her "heart [wa]s just not in the industry" and that she wanted

to leave the pharmaceutical and biotechnology world to pursue her passion.  Martin

remained in Atlanta and works as a realtor.

Martin filed a complaint against Lilly alleging causes of action under the

ADA and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.

By granting in part and denying in part Lilly's motion for summary judgment, the

district court narrowed the theories Martin could pursue in her ADA discrimination

claim.  The district court barred her from pursuing a claim that her eventual

*termination* was an adverse employment action because she failed to exhaust her

administrative remedies on that theory.  The district court also held that Martin had

4

not made a sufficient showing that Craven's negative performance evaluations of her disentitled her to a merit raise.  But the district court permitted Martin to proceed on a theory that her "negative performance evaluations played a significant role in her displacement from Lilly."

Martin tried her remaining ADA and FMLA claims to a jury.  Lilly moved for judgment as a matter of law on all the claims at the close of Martin's case-in-chief and again at the close of all the evidence.  The district court denied the motion except as to punitive damages.  The jury thereafter found in Martin's favor on only the ADA discrimination claim.  The jury did not award any damages for lost wages or benefits, but awarded $600,000 to compensate Martin for emotional pain and mental anguish caused by the adverse employment action.[1]  After trial, Lilly renewed its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 and filed an alternative Rule 59 motion for new trial.  The district court denied the motions but remitted the compensatory damages award to the statutory cap of $300,000.

## II.

We review *de novo* the district court's denial of Lilly's motion for judgment as a matter of law, applying the same standards as the district court.  *See Wood v.*

---

[1] The jury answered "yes" to the question whether "one or more of the following was an adverse action: Ms. Martin's 2009 Performance Management Evaluation and subsequent year-end rating (issued in 2010), Ms. Martin's 2010 Performance Management Evaluation and subsequent year-end rating (issued in 2011), or the displacement of Ms. Martin from her territory[.]"

*Green*, 323 F.3d 1309, 1312 (11th Cir. 2003).  Under Rule 50, a party is entitled to judgment as a matter of law "[i]f [an opposing] party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." Fed. R. Civ. P. 50(a)(1); *see also Bogle v. Orange Cty. Bd. of Cty. Comm'rs*, 162 F.3d 653, 659 (11th Cir. 1998) ("[I]n order to survive a defendant's motion for judgment as a matter of law, . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim.").  We review all the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party without making credibility determinations or reweighing the evidence.  *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192–93 (11th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148–151, 120 S. Ct. 2097, 2109–2110 (2000)). We "give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151, 120 S. Ct. at 2110 (quoting 9A C. Wright & A. Miller, *Federal Practice and Procedure* § 2529, at 300 (2d ed. 1995)).

III.

The ADA prohibits a covered entity from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To prevail on a claim for intentional discrimination under the ADA, Martin had to prove by a preponderance of the evidence that she had a disability; that she was qualified to work in her position, with or without some reasonable accommodation, despite her disability; and that she suffered an adverse employment action because of her disability (i.e., that she was discriminated against based on her disability).  *See Collado v. United Parcel Serv., Co.*, 419 F.3d 1143, 1149 (11th Cir. 2005); *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998).

Lilly does not challenge the jury's findings that Martin was disabled and was a qualified individual, but it takes issue with the jury's remaining findings that Martin suffered an adverse employment action and that Lilly took that action because of her disability.  The jury had found that one or more of the following was an adverse action: her 2009 performance evaluation and year-end rating, her 2010 performance evaluation and year-end rating, or the displacement from her original territory.  The verdict form did not ask the jury to identify more

7

specifically which action or actions it found to be adverse. After thoroughly reviewing the record, we conclude that no reasonable jury could find that any of these actions, standing alone or together, constituted an adverse employment action.

The ADA prohibits a wide variety of adverse employment actions when the employer takes those actions for a prohibited reason. *Dekalb*, 145 F.3d at 1447. "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1261 (11th Cir. 2001). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 2268 (1998); *see also Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (explaining that the various terms courts have used to describe the "threshold level of substantiality," such as "significant," "materially adverse," and "serious and tangible," are "essentially interchangeable" and all require that the employer's action impacts the "'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way"). We apply an objective test and require a plaintiff to demonstrate that a reasonable person in her position

would view the employment action in question as adverse.  *Dekalb*, 145 F.3d at 1448–49.

At the outset, we note that in the district court's order denying Lilly's motion for judgment as a matter of law, the district court in essence determined that the performance evaluations and year-end ratings, on their own, did not constitute adverse actions because they did not directly result in Martin being denied a pay raise.  Instead, the district court explained that the evaluations and year-end ratings could be adverse because they led to a tangible, negative effect on Martin's employment by contributing to her displacement.  We agree that the evaluations and year-end ratings, on their own, did not constitute adverse actions.

"Negative performance evaluations, standing alone, do not constitute adverse employment action," *Lucas*, 257 F.3d at 1261, and "courts are wisely reluctant to treat job performance memoranda as actionable . . . where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline," *Davis*, 245 F.3d at 1241; *cf. Gillis v. Ga. Dep't of Corr.*, 400 F.3d 883, 888 (11th Cir. 2005) ("[A]n evaluation that directly disentitles an employee to a raise of any significance is an adverse employment action . . . .").  Although Martin maintains that her performance ratings negatively impacted her compensation, no reasonable jury could conclude on this record that the "low-successful" performance ratings

led to her losing out on a salary increase.  Although Martin did not receive any salary increases while working directly under Craven, the evidence was insufficient to determine how Lilly awarded salary increases or to allow a reasonable jury to conclude without speculating that Martin would have received pay raises had she received "successful" ratings.

Martin also contends the performance evaluations may stand on their own as adverse actions because they interfered with her ability to obtain a new position at Lilly in Atlanta, and thus, they led to her termination.  Evidence at trial indicated that the Lilly managers who interviewed Martin during her displacement period requested her 2008, 2009, and 2010 performance reviews.  But the evidence presented at trial did not reveal to what extent the Atlanta hiring managers considered Martin's performance reviews, the qualifications and experience they were seeking, or Martin's competition within Lilly for those positions.  The evidence is simply insufficient for a reasonable jury to conclude that the performance reviews led to her failing to get a job with Lilly in Atlanta.  While negative reviews may affect an employee's future prospects, "[a] negative evaluation that otherwise would not be actionable will rarely, if ever, become actionable merely because the employee comes forward with evidence that his future prospects have been or will be hindered as a result." *Davis*, 245 F.3d at 1243.

We thus turn to whether Martin's displacement was an adverse employment action for which Lilly may be held liable under the ADA.  The evidence at trial demonstrated that the "low successful" ratings Martin received in 2009 and 2010 made the difference in her losing the northern-Georgia sales territory to Grant through the HR Index.  The result of the displacement was that Lilly did not automatically place Martin in a sales territory.  But this is not the end of the story.  Determining whether an employer's action is adverse "will often depend upon the particular circumstances" of the case because "[c]ontext matters." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 126 S. Ct. 2405, 2415 (2006).  Here, we must also consider that Lilly gave Martin six months to obtain a new job before the reorganization and displacement took effect in January 2012 and another three months after that to continue searching for positions while retaining her full salary and benefits.  Although Martin had to apply for positions within Lilly (rather than being automatically placed in a position), Lilly offered Martin a position as a sales representative in the NABS division in Charlotte, North Carolina.  This was the same position Martin held in Atlanta, was a position for which she had applied, and was in a location she requested.

An employment action is not adverse if the employer rescinds it before the employee suffers any tangible harm.  *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001).  For instance, in *Stavropoulos v. Firestone*, 361

F.3d 610 (11th Cir. 2004), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006), an untenured university professor alleged that she suffered an adverse action as a result of retaliation under Title VII[2] when she learned that the university art faculty voted not to renew her contract. She filed a grievance to challenge that decision, and the university reversed course. The professor retained her job without losing any pay or benefits. 361 F.3d at 615. Here, to the extent the position in Charlotte was a purely lateral transfer, which would not be adverse, *see Dekalb*, 145 F.3d at 1450 (stating that a purely lateral transfer is not an adverse employment action), Lilly essentially rescinded any adverse action that occurred with its notice of displacement when it offered Martin the Charlotte NABS position.[3]

---

[2] At the time we decided *Stavropoulos*, our definition of an adverse action under Title VII's anti-retaliation provision required an adverse *employment* action that either constituted an "ultimate employment decision" or else met "some threshold level of substantiality." 361 F.3d at 617. The Supreme Court in *Burlington Northern* held that the scope of Title VII's "antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harms," thus rejecting our prior approach to limit adverse actions in this context to adverse *employment* actions. 548 U.S. at 67, 126 S. Ct. at 2414. *Stavropoulos*'s discussion of adverse employment actions nonetheless remains helpful in the ADA discrimination context.

[3] Martin also complains that, by not automatically placing her in an open position, Lilly forced her to endure the inconvenience and frustration of competing for open positions within Lilly. But no reasonable jury could conclude that this aspect of the displacement was material and serious enough to constitute an adverse action. Instead, it strikes us as similar to the inconvenience the professor in *Stavropoulos* faced: to challenge the non-renewal vote, the professor had to file a grievance and hire an attorney to represent her before the faculty senate. Even though the university did not reimburse her for the cost of that attorney, we concluded that "[a]ny emotional distress or costs" the professor endured was "too insubstantial to be considered an adverse employment action since the review proved successful." 361 F.3d at 618.

The remaining consideration is whether the location of this new position made it something other than a purely lateral transfer. On this point, Martin maintains that the transfer to a city 240 miles from her current home in Atlanta was not a *de minimus* inconvenience. And despite the fact that Lilly would have paid her full relocation expenses and that Martin applied for positions in North Carolina, told Lilly that North Carolina was "geographically closest to where I want to be," and testified at trial that she wanted to move to Charlotte, Martin asserts that the fact that she did not move to North Carolina after leaving Lilly demonstrates that the change of location was adverse.

To be sure, we have recognized that "transfers that involve arduous travel" may be adverse. *Dekalb*, 145 F.3d at 1452 (citing *Maddow v. Proctor & Gamble Co.*, 107 F.3d 846, 852 (11th Cir. 1997)). In *Maddow*, for example, we held that a sales representative made out a *prima facie* case that she was adversely affected when the only position her employer offered her would have required her to move from Atlanta to Alabama. 107 F.3d at 852–53. Even though the employee in *Maddow* later accepted a job outside the company that involved travel to Alabama, she had told her employer that she would accept only a position in Atlanta. *Id.* Here, quite the opposite is true. Martin applied for positions in Charlotte and told Lilly she wanted to be in North Carolina. Although we do not consider the subjective preferences of the employee to determine whether an employer's action

is adverse, we do consider what a reasonable person *in the plaintiff's position* would find adverse. *Dekalb*, 145 F.3d at 1453. And no reasonable jury could conclude that a plaintiff who received a job offer for a position for which she applied and in a location she sought suffers an adverse action because of the location of the transfer.[4]

Although not dispositive, the evidence also demonstrates that Martin did not turn down the job offer in North Carolina because she considered the location adverse. Martin turned down the job because she decided she could not continue to work under Craven's supervision and because she wanted to pursue other passions outside the pharmaceutical industry. In a somewhat baffling turn, Martin contends the position in North Carolina was adverse because she would have continued reporting to Craven. But the fact that she would have continued reporting to Craven supports Lilly's proposition that the position was a lateral transfer. We understand why Martin may not have wanted to continue working under Craven, but the fact that Lilly offered her essentially the same position she lost through the reorganization does not somehow make the transfer adverse.

---

[4] Further, even if the offer to transfer to North Carolina was adverse because of the geographic location, there is no evidence that Lilly offered the position in that location *on the basis* of Martin's disability. Rather, Lilly offered the position because Martin expressed her interest in that location through applying for the position and sharing her interest in transferring to North Carolina. "[A] transfer cannot be 'because of a disability' if it occurred as the result of an employee's own request." *Dekalb*, 145 F.3d at 1454.

To sum up, we conclude that no reasonable jury could find that a reasonable person in Martin's position suffered an adverse employment action, whether through the performance reviews and year-end ratings or her displacement from her territory.  And because Martin failed to establish an adverse action, we reverse the district court's denial of Lilly's motion for judgment as a matter of law and remand for the district court to enter judgment in favor of Lilly.

\*

For the reasons stated above, we REVERSE and REMAND for the district court to enter judgment in favor of Lilly on Martin's ADA discrimination claim.

JORDAN, Circuit Judge, dissenting:

This is, in some ways, an uncommon disability discrimination case. As the majority explains, Ms. Martin was ultimately offered an almost identical sales representative position in Charlotte. And when she applied for that position, she knew it would require her to work for Darrell Craven, the same person she believed discriminated against her based on her disability. *See* D.E. 228 at 183. So I can understand where the majority is coming from in saying that Ms. Martin did not suffer an adverse employment action. But at the end of the day, I think this was an issue for the jury, and cannot concur in setting aside its verdict.

Our cases generally hold that a transfer or reassignment can be adverse "if it involves a reduction in pay, prestige[,] or responsibility." *Evans v. Books-A-Million*, 762 F.3d 1288, 1297 n.5 (11th Cir. 2014). But those cases are not directly on point because this is not a typical transfer case. Ms. Martin was not simply moved from one position to another. Instead, she was involuntarily "displaced" from her sales representative position in Atlanta when Eli Lilly reorganized the Georgia territories. *See* D.E. 228 at 25, 169. Ms. Martin, in other words, lost her job in Atlanta, and Eli Lilly, instead of transferring her, required her to affirmatively apply for and obtain a new position in the company. *See id.* at 55, 172–74, 195. That, I submit, is no different than refusing to renew an employee's contract, which we have held is an adverse employment action. *See Quigg v.*

*Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016) ("[T]he School District's refusal to renew Quigg's contract was clearly an adverse employment action[.]"). *See also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as . . . firing[.]").

Admittedly, this case is close, in part because Ms. Martin testified that Charlotte was one of her preferred locations for a new position and that, being a native of North Carolina, she had some reasons to return there. *See* D.E. 228 at 44, 179–82.  But we should not forget that Ms. Martin suffered from lupus and depression, and her "very important [medical] treatment team" was in Atlanta. *Id.* at 44.  In fact, Ms. Martin had also applied for two positions in Georgia, but did not receive an offer for either one. *See id.* at 196.  On balance, I do not think we can hold as a matter of law that the involuntary "displacement" did not constitute an adverse employment action just because Charlotte was one of Ms. Martin's two desired locations when applying for a new position.

When reviewing a Rule 50 motion, "we must consider all the evidence in the light most favorable to [the non-moving party] and grant [her] the benefit of all reasonable inferences." *Bogle v. Orange Cty. Bd. of Cty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998).  Judgment as a matter of law is only appropriate "if the facts and inferences point so overwhelmingly in favor of the movant that reasonable

people could not arrive at a contrary verdict." *Id.* (internal quotation marks and alteration omitted).   To the extent that Ms. Martin's testimony was at times inconsistent, that presented a credibility issue for the jury to resolve.   *See Home Indem. Co. v. Williamson*, 183 F.2d 572, 578 (5th Cir. 1950) (explaining, on rehearing, that "witnesses contradict[ing] themselves" present credibility issues which are left to the jury).   The jury could have reasonably found that, under the circumstances, relocating to Charlotte (with Mr. Craven still as her supervisor) was materially adverse.

With respect, I dissent.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 21, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-11537-GG
Case Style: Jenny Martin v. Eli Lilly & Co., et al
District Court Docket No: 1:12-cv-01623-CAP

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellee.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, GG at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs